FILED

1/22/2020

Clerk, U.S. District Court
District of Montana
Helena Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| ESTATE OF SEAN PATRICK O'BRIEN, ROBIN LARSON, and K.O., a minor child, by and through Personal Representative Robin Larson, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LIVINGSTON, a political subdivision of the State of Montana, KEVIN ENGLE, ANDREW EMANUEL, DALE JOHNSON, and JOHN DOES 1-10, <br><br> Defendants. | CV 18-106-BLG-SPW-TJC <br><br><br> **FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |

Plaintiffs, the Estate of Sean Patrick O'Brien, Robin Larson, and K.O., a minor child, by and through personal representative Robin Larson, (collectively, "Plaintiffs"), bring this action alleging claims under 42 U.S.C. § 1983 and under Montana law for wrongful death and survivorship after the decedent, Sean Patrick O'Brien ("O'Brien") was shot and killed by Livingston Police Officers Kevin Engle ("Engle") and Andrew Emanuel ("Emanuel").

Presently before the Court are Engle and Emanuel's Motion for Summary Judgment (Doc. 23), and Engle and Emanuel's Motion for Partial Summary Judgment (Doc. 40). The motions have been referred to the undersigned under 28

U.S.C. § 636(b)(1)(B), and are fully briefed and ripe for the Court's review.

Having considered the parties' submissions, the Court **RECOMMENDS**

Engle and Emanuel's Motion for Summary Judgment (Doc. 23) be **GRANTED**,

and Engle and Emanuel's Motion for Partial Summary Judgment (Doc. 40) be

**GRANTED**.

## I.      FACTUAL BACKGROUND

On the evening of January 2, 2016, at approximately 7:40 p.m., Livingston

Police Officers Engle and Emanuel were having dinner together when they

received a radio call and were dispatched to the Livingston Shopko retail store.

The dispatcher stated[1] over the radio that "a 911 caller says she is the general

---

[1] Plaintiffs contend the dispatcher's statements are hearsay, and should not be considered. Plaintiffs' objection is overruled. The statements, which were set forth in the Affidavits of Engle and Emanuel, are not hearsay. Hearsay is a statement "offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Here, the statements are offered to establish what the officers heard from dispatch, not to establish the truth of the dispatcher's statements. "The hearsay rule does not prevent a witness from testifying as to what he has heard; it is rather a restriction on the proof of fact through extrajudicial statements." *Dutton v. Evans*, 400 U.S. 74, 88 (1970). *See also Calmat Co. v. Dept. of Labor*, 364 F.3d 1117, 1124 (9th Cir. 2004) ("If the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay."). Here, the dispatcher's statements are offered to show Engle and Emanuel had received certain information regarding an incident, which is relevant to establish why the officers responded to the scene and what had been conveyed to them when they encountered O'Brien. The statements are not offered to show that O'Brien had, in fact, committed certain acts prior to the officers' arrival. As such, the dispatcher's statements are not hearsay.

manager -- a girl at the front said a guy came in with a dark jacket -- he said if you haven't called the cops, you better call the cops, cuz I'm gonna shoot someone -- he is now out front in the bushes." The dispatcher also said, "be advised he had his hand inside his jacket like he was holding something. He is in front in the parking lot with people walking around right now."[2]

Engle arrived on scene first and entered the Shopko parking lot in his patrol car. Engle drove toward the north end of the building. Emanuel arrived shortly thereafter, and drove toward the south end. Both Officers' patrol cars were equipped with Watchguard video and audio recording equipment. As a result, audio of the entire encounter between Engle, Emanuel and O'Brien was captured on the WatchGuard recording from Engle's patrol car, and most of the encounter can also be seen on the video from Engle's car. A portion of the encounter was also captured on Emanuel's WatchGuard video. The entire encounter, from the time the officers first made contact with O'Brien until he was shot, lasted less than one minute.

Engle stopped his vehicle in a driveway on the north side of the Shopko

---

[2] Defendants submitted a recording and a transcript of the dispatcher's statements with their Reply Brief. (*See* Doc. 37.) Plaintiffs move to strike the submission as improperly submitted new evidence. (Doc. 39.) Plaintiffs' motion is **DENIED as moot**. The Court has determined the dispatcher's statements are not hearsay and are properly before the Court through the original Affidavits of Engle and Emanuel. As such, the Court need not rely on the evidence submitted with Defendants' Reply Brief.

parking lot.  The driveway had large patches of ice and snow.  Engle states he saw a man matching the description he had been provided by dispatch.  The man was standing behind some bushes at the front of the Shopko store to the north of the building's entrance.  The man was later identified as O'Brien.

After Engle stopped his patrol car, he said, "he's here" and then got out of his vehicle.  O'Brien emerged from the bushes and began to move toward Engle.  Engle states he saw O'Brien holding a red-handled knife in his hand, which was approximately 3-4 inches long.  Engle states it appeared to be some kind of folding knife.  Plaintiffs assert it was not a folding knife, but was a red Craftsman brand utility knife that O'Brien carried everyday for work.  The blade was not open.  Engle shouted "stop, stop" at O'Brien and pulled out his service weapon with his right hand.  O'Brien did not stop or comply.  Instead, he responded, "fuck you," and continued walking toward Engle.  This portion of the encounter cannot be seen on either Watchguard video, but it can be heard on the audio from Engle's patrol car.

When O'Brien did not comply, Engle states he became concerned for his safety.  He therefore drew his Taser with his left hand and fired it at O'Brien when he was approximately 15-20 feet away from him.  O'Brien grunted in apparent pain from the taser probes, although the taser did not stop him.  Engle then yelled "get down, on the ground, get on the ground."  But O'Brien did not comply;

4

instead he ran away from Engle.  At that point, O'Brien and Engle ran into view of the Watchguard video on the front of Engle's patrol car.  Engle pulled the trigger on the Taser a second time, but it again did not stop O'Brien.  O'Brien can be heard grunting a second time as he continued to run away from Engle.

When Emanuel heard Engle state "he's here," he drove his vehicle toward the north end of the building where Engle was located.  As Emanuel drove toward Engle's location, Engle and O'Brien come into view on Emanuel's Watchguard video.  Emanuel states that as he was driving toward Engle, he saw that Engle had deployed his taser against O'Brien and that it was not effective.  The video from Emanuel's vehicle also appears to show Engle taser O'Brien without effect.

After the taser was not effective, Engle holstered his service weapon and attempted to holster his taser, as he ran after O'Brien yelling "get on the ground, get on the ground."  Engle was unable to holster the taser and dropped it on the ground.  O'Brien did not comply with Engle's commands.  Instead, he continued to run away and yelled "fuck you."  O'Brien then stopped and turned to face Engle. At that point, Engle contends O'Brien stated "shoot, shoot dammit."  Plaintiffs dispute this.  The Court has reviewed the video, but the audio is unclear on this point.

As O'Brien turned to face Engle, Emanuel pulled his patrol vehicle into the driveway ahead of and just to the south of Engle's vehicle.  As Emanuel was

5

stopping, O'Brien made two feints forward toward Engle, and said "little fucker." Engle took a couple of steps backward, and yelled "get on the ground." O'Brien responded, "fuck you" and waved his arms, perhaps in an attempt to dislodge the taser wires. Engle again yelled "get on the ground." O'Brien started to walk north across the driveway and in the direction of Engle, waving his arms, and again responded "fuck you." As O'Brien moved, Engle moved backward across the driveway, maintaining distance between himself and O'Brien. Plaintiffs assert O'Brien was circling around or "flanking" Engle in an attempt to escape.

As O'Brien reached the north side of the driveway, and stepped onto a snowy berm in a field alongside the driveway, Engle yelled "pull (sic) your hands up, put the knife down, put the knife down." O'Brien did not comply; rather, he switched the knife from his right hand to his left hand, and then reached into his coat with his right hand. As this was happening, Engle remained in the driveway and stepped back. O'Brien continued to move with his hand in his coat, and Engle yelled "show me your hands, put the knife down. Stop." As Engle yelled at him, O'Brien took two quick steps to his left, almost parallel to the driveway with his hand still in his coat.

While this was occurring, Emanuel got out of his vehicle, and walked to the front with his gun drawn. Emanuel states he heard Engle yell "drop the knife" more than once and O'Brien yelling "fuck you." Emanuel saw that O'Brien was

6

holding a metallic object in his hand in a way a person would hold a knife.  Based on what he heard Engle say, and what he saw, Emanuel yelled, "put the knife down, put it down."

As Engle yelled "stop," O'Brien pulled his hand out of his jacket, hunched forward slightly, and started to run in the direction of Engle.  The parties dispute whether O'Brien was running toward Engle or trying to run past him.  O'Brien had his left arm extended forward with something metallic in his left hand, possibly keys, and the knife in his right hand.  Engle stepped back and to his left.  O'Brien continued to run, saying "fuck you."

As O'Brien continued to run in the direction of Engle, Emanuel fired his weapon, hitting O'Brien.  Engle fired immediately thereafter, also hitting O'Brien.  O'Brien fell to the pavement near the spot where Engle had been standing when O'Brien started running.  Plaintiffs assert O'Brien's direction of travel was altered by the Officers' bullets striking his body.

Engle states he fired his weapon when O'Brien was approximately 7-10 feet from him in order to protect himself.  Engle explains he was concerned that O'Brien was reaching for a firearm or other weapon when he reached into his coat.  His concern was based in part on O'Brien's action in reaching into his coat, and in part based on the dispatcher's statement that O'Brien reportedly said he was going to shoot someone.  Engle also states he was afraid he was going to be stabbed by

O'Brien.  Although the blade was not deployed, Engle said he knew a knife blade

could be quickly deployed.  Engle was also concerned about his footing because it

was icy, and the possibility that O'Brien, who was a much larger man than he,

could have gotten on top of him.

Emanuel states he fired his weapon to protect Engle when O'Brien

continued to run towards Engle.  Emanuel explains he also saw O'Brien put his

hand in his coat and pull it back out, causing him concern because the original call

made reference to O'Brien stating that someone was going to get shot.  Emanuel

further states he was extremely afraid O'Brien was going to stab Engle when

O'Brien started running.  Emanuel states the distance between O'Brien and Engle

was closing fast, and there insufficient time to protect Engle from being injured by

an edged weapon.  Emanuel was also concerned because Engle was backing up on

snow and ice.  O'Brien was bigger than Engle, and if Engle fell, O'Brien would

have been on him very quickly.

## II.    LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party

demonstrates the absence of a genuine issue of material fact and entitlement to

judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).  Material facts are those which may affect the outcome

of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute

as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party.  *Id*.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

9

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

"When video captures the events in question, no genuine dispute of fact exists for anything that is clearly discernable in a videotape of the events at issue[.]" *Estate of Simpson v. Yellowstone County*, 229 F.Supp.3d 1192, 1196 (D. Mont. 2017). If the video does not capture "everything," however, the court may consider supplemental evidence, "as long as it is viewed in the light most favorable to the non-moving party." *Id.* When considering affidavits submitted by law enforcement officers, the court must scrutinize the affidavits to ensure that they are consistent with the other admissible evidence. *Cruz v. City of Anaheim*, 767 F.3d 1076, 1079 (9th Cir. 2014).

## III.   ANALYSIS

### A.   Engle and Emanuel's Motion for Summary Judgment

Engle and Emanuel move for summary judgment on the following grounds: (1) the doctrine of qualified immunity bars Plaintiffs' § 1983 claim against them; and (2) Montana Code Ann. § 2-9-305(5) bars Plaintiffs' state law tort claims

against them.  Plaintiffs oppose, arguing the Court should postpone ruling on the issue of qualified immunity because there are fact disputes that should first be resolved by a jury.  Plaintiffs further argue statutory immunity under § 2-9-305(5) does not apply until after there has been a recovery against a governmental entity.

### a.    Qualified Immunity

Qualified immunity shields federal and state officials from civil liability under 42 U.S.C. § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Qualified immunity is 'an *immunity from suit* rather than a mere defense to liability.'  Thus, '[w]here the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.'"  *Conner v. Heiman*, 672 F.3d 1126, 1130 (9th Cir. 2012) (emphasis in original) (internal citations omitted).

"To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016).  The court has discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first. *Pearson v. Callahan*, 555

U.S. 223, 236 (2009).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) *citing Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012). The Supreme Court has cautioned that clearly established law should not be defined at a high level of generality. *Id.* The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* It is not necessary to find a case directly on point, "in which the very action in question has been held unlawful," but "in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id. citing Malley v. Briggs*, 475 U.S. 335, 341 (1986). "[T]he 'clearly established' prong of the qualified immunity analysis is a matter of law to be decided by a judge." *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018). The plaintiff bears the burden of proving the existence of a clearly established right at the time of the alleged misconduct. *Maraziti v. First Interstate Bank*, 953 F.2d 520, 523 (9th Cir. 1992).

Here, the parties have only addressed the second prong of the qualified immunity test. Accordingly, the relevant question is whether it was clearly established under existing precedent that Engle and Emanuel's use of deadly force

against O'Brien was excessive and violated the Fourth Amendment.  The Court

finds that neither Supreme Court nor Ninth Circuit precedent on similar facts

would have put Engle and Emanuel on notice that their actions violated the law.

Rather, the case law indicates the opposite.

In recent years, the Supreme Court has reversed several federal courts'

decisions denying qualified immunity.  *White v. Pauly*, ____ U.S. ___, 137 S. Ct.

548, 551 (2017).  "The Court has found this necessary both because qualified

immunity is important to 'society as a whole,' and because as 'an immunity from

suit,' qualified immunity 'is effectively lost if a case is erroneously permitted to go

to trial.'"  *Id.* (citations omitted) (quoting *Pearson v. 552 Callahan*, 555 U.S. 223,

231 (2009).

One such case which is particularly applicable here is *Kisela v. Hughes*, ___

U.S. ___, 138 S.Ct. 1148, 1150 (2018).  In *Kisela*, three officers responded to a

911 call concerning a woman (Hughes) acting erratically with a knife.  Hughes was

reportedly hacking a tree with a kitchen knife.  *Id.* at 1151. Within "perhaps just a

minute" of arriving on scene, one of the officers shot Hughes.  *Id.* at 1150.

Between the time the officers arrived and the time of the shooting, the officers

observed Hughes emerge from a house carrying a knife at her side and walk

toward another woman (Chadwick).  *Id.* at 1151.  Hughes stopped about six feet

from Chadwick.  *Id.*  A chain-link fence with a locked gate separated the officers

13

from the two women.  *Id.*  The officers drew their guns and ordered Hughes to

drop the knife at least twice.  *Id.*  Hughes appeared calm, but did not comply with

their commands.  *Id.*  One of the officers then dropped to the ground and shot

Hughes four times through the fence.  *Id.*  All of the officers later stated that at the

time of the shooting, they believed Hughes was a threat to Chadwick.  *Id.*

The district court denied the officer's motion for summary judgment based

on qualified immunity.  The Supreme Court reversed, finding the officer's use of

force in that situation did not violate clearly established law.  *Id.* at 1153.  In so

holding, the Court emphasized that "[u]se of excessive force is an area of the law

'in which the result depends very much on the facts of each case,' and thus police

officers are entitled to qualified immunity unless existing precedent 'squarely

governs' the specific facts at issue."  *Id*. at 1152-53 (quoting *Mullenix v. Luna*, ___

U.S. ____, 136 S.Ct. 305, 308 (2015)).  The Court explained that "[a]n officer

'cannot be said to have violated a clearly established right unless the right's

contours were sufficiently definite that any reasonable official in the defendant's

shoes would have understood that he was violating it.'"  *Id.* at 1153 (quoting

*Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014)).  Applying these standards in

*Kisela*, the Court found "[t]his is far from an obvious case in which any competent

officer would have known that shooting Hughes to protect Chadwick would violate

the Fourth Amendment."  *Id.*

14

Comparing the facts of *Kisela* to the facts of this case, demonstrates that Engle and Emanuel are entitled to qualified immunity.  Here, like the police in *Kisela*, Engle and Emanuel received a report of an individual who was acting erratically.  Specifically, Engle and Emanuel were advised by dispatch that O'Brien allegedly told Shopko employees "if you haven't called the cops, you better call the cops, cuz I'm gonna shoot someone."

Thereafter, O'Brien engaged in more aggressive and threatening conduct than Hughes.  Hughes got close to another woman with a knife, but appeared calm. In contrast, O'Brien was tased with no impact; he ran from Engle and then turned and made movements toward him; he called Engle a "little fucker," yelled "fuck you" five times, clearly indicating that he did not intend to comply; he reached into his coat as though reaching for a weapon; and he ran in Engle's direction holding a knife in his hand.  In *Kisela,* Hughes ignored two commands to drop the knife. O'Brien, in contrast, ignored four commands to "stop," four commands to "get down on the ground," three commands to "put down the knife," and two commands to "show his hands," or "put them up."

Additionally, both cases involved situations where the officer believed that use of force was necessary to prevent a serious threat to another.  In *Kisela*, the officer who shot Hughes said he fired because he believed Hughes was a threat to Chadwick.  Likewise, Emanuel states that he fired his weapon to protect Engle

15

because he was afraid that O'Brien was going to stab Engle.  Further, the officers

in *Kisela* were not themselves in apparent danger, as they were separated from

Hughes by a chain link fence.  Whereas, Engle stated he was afraid that he was

going to be stabbed by O'Brien, who was 3-4 inches taller than he was,

outweighed him by about 40-50 pounds, and who was approximately 10 feet away

from Engle on icy ground.  In both cases, the events unfolded in less than one

minute.

If the officer in *Kisela* was not on notice that his actions would violate the

Fourth Amendment, it is far from obvious that Engle and Emanuel would have

been on notice that their use of deadly force here – where they faced more

threatening circumstances – was unlawful.

Cases from the Ninth Circuit likewise illustrate that Engle and Emanuel

should be granted qualified immunity.  In *Vos v. City of Newport Beach*, for

example, the Ninth Circuit applied *Kisela* and held police officers were entitled to

qualified immunity.  *Voss v. City of Newport Beach*, 892 F.3d 1024, 1035 (9th Cir.

2018).  There, the officers confronted an erratic individual (Vos) who had taken

refuge in a 7-Eleven convenience store.  *Id.* at 1028-29.  The officers were

dispatched to the store upon reports of an agitated man running around the store

shouting things like "[k]ill me already, dog," cursing at people, and holding a pair

of scissors.  *Id.*  One of the officers observed Vos through the store's glass doors

yelling, screaming and pretending to have a gun. *Id.* at 1029.  At least eight officers ultimately responded, and they set up two patrol cars in a "v" formation outside the front entrance of the store and used the vehicle's doors for cover. *Id.* The officers were armed with both lethal and less than lethal weapons. *Id.*  Vos eventually ran toward the open front doors, holding the scissors over his head. *Id.* The officers ordered Vos to drop the weapon twice, but he did not comply. *Id.* The distance between Vos and the officers when he started running was about 30 feet. *Id.*  One officer fired a less than lethal weapon.  Within seconds, two other officers fired AR-15 rifles, killing Vos. *Id.*

The Ninth Circuit held existing precedent did not support the conclusion that the officers acted unreasonably in those circumstances "beyond debate." *Id.* at 1035.  Likewise, here, it is not beyond debate that Engle and Emanuel acted unreasonably.  Like in *Voss*, O'Brien acted erratically in a store, pretended to have something his pocket like a gun, actually possessed a weapon, ignored commands to drop the weapon, and ran in the direction of Engle holding the weapon.  But unlike *Voss*, Engle and Emanuel gave O'Brien 15 commands; the officers in *Voss* only gave two.  Also, Engle first used less than lethal means to gain O'Brien's compliance, only shooting him after the taser and additional verbal commands were not successful.  In contrast, the officers in *Vos* used non-lethal and lethal force almost simultaneously.  Finally, the circumstances of this case show Engle

was in a more vulnerable position than the officers in *Vos*.  Engle was standing in the open, on an icy driveway.  The officers in *Voss* were situated behind car doors for cover, and had multiple weapons, including two AR-15's available to them.  If the facts of *Voss* supported a finding of qualified immunity, so too should the facts here.

Other Ninth Circuit cases also illustrate that qualified immunity is appropriate in this case.  *See e.g. Woodward v. Tucson*, 870 F.3d 1154, 1162 (9th Cir. 2017) (holding officers were entitled to qualified immunity under the "clearly established" prong where the officers shot a man who advanced toward them in a small cluttered apartment while yelling with a two-foot length of broken hockey stick raised in a threatening manner); *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1016-17 (9th Cir. 2017) (officer was entitled to qualified immunity where he shot a mentally ill man who had multiple knives in his pockets, and drew one of them from his back pocket); *Blanford v. Sacramento Cty.*, 406 F.3d 1110, 1112 (9th Cir. 2005) (holding deputies were entitled to qualified immunity where they shot a man after he refused their commands to drop a sword he was carrying around a residential neighborhood; he had raised the sword and growled, and had then moved toward a home (his own, but unknown to the officers), knocked on the door, and then moved toward the backyard).

Plaintiffs do not cite, discuss, or attempt to distinguish any of these recent

cases from the Supreme Court and Ninth Circuit.  Instead, Plaintiffs cite *Glenn v. Washington Cty.*, 673 F.3d 864 (9th Cir. 2011) to attempt to establish that Engle and Emanuel were on notice they would not be justified in using deadly force against a suspect who is holding a knife and refusing to comply with the officers' instructions.  But the facts of *Glenn* are plainly distinguishable from this case.

In *Glenn*, the officers were dispatched to a residence to address a domestic disturbance involving an intoxicated, suicidal 18-year-old male.  *Id.* at 867.  The young man was living with his parents, and his mother called 911 for help after her "distraught and intoxicated" son began breaking household property and threatening to kill himself by holding a pocket-knife to his throat.  *Id.* at 866.  She also advised there were hunting rifles inside the house, but they were locked up and her son could not get to them.  *Id.*

When the first officer responded, he was initially told the man was over by the garage, and that they had him calmed down.  *Id.* at 868.  The officer located the man, who was standing by a friend and his parents.  He was not in an altercation with anyone, was not threatening anyone, and no one was attempting get away from him.  But he was holding the pocketknife to his own neck.  *Id.*  The officer ordered the man to "drop the knife or I'm going to kill you."  *Id.*  Another officer arrived, and he likewise drew his gun and screamed commands such as "drop the knife or you're gonna die."  *Id.*  The man's friend told the officers to calm down,

and that he was only threatening to hurt himself.  *Id.*  Nevertheless, the officers ordered the man's friends to stand behind them, and ordered his parents to go into the house.  *Id.*

Another officer then arrived with a beanbag gun, and he was ordered to "beanbag him."  The officer opened fire with six beanbag rounds from a shotgun. Witnesses describe that the young man put his hands down and began to move away from the beanbag fire toward the alcove between the house and garage – "in the most obvious line of retreat from the fire."  *Id.* at 869.  But after he took one or two steps in the direction of the house, two officers began firing their semiautomatic weapons, striking him eight times and killing him.  *Id.*  All of the lethal fire occurred before the last beanbag round was fired.  *Id.*

The situation in *Glenn* is not sufficiently analogous to place Engle and Emanuel on notice that their conduct violated the constitution.  In *Glenn*, police responded to a report that an intoxicated individual was threatening to harm himself.  Whereas, here, Engle and Emanuel were called to respond to an erratic individual who had reportedly made statements that he was "gonna shoot someone" at a retail store.  When the officers in *Glenn* arrived, the suspect was not threatening the officers, and he was not threatening any other person at the scene. He was only threatening himself, by standing in a fixed position in the driveway, holding a knife to his own neck.  *Id.* at 868.  Here, in contrast, O'Brien was

walking around, made two feints towards Engle, held a knife in his hand, put his other hand in his coat pocket as if reaching for a weapon, and ultimately ran in the direction of Engle with the knife in his hand.  In addition, Engle twice attempted to use non-lethal force to subdue O'Brien, while the officers in *Glenn* used deadly force before the last beanbag round had even been fired.

Moreover, even if the facts of *Glenn* are deemed analogous to this case, the legal holding in *Glenn* does not establish that the use of force in that situation violated the Fourth Amendment.  The court in *Glenn* expressly did not find the officers' use of deadly force violated the suspect's Fourth Amendment rights.  *Id.* at 870.  Rather, the court determined there were genuine issues of fact regarding the first prong of the qualified immunity analysis.[3]  *Id.*  In fact, the court acknowledged that "[a] jury could view the facts as the district court did, and likewise reach the conclusion that the officers' use of force was reasonable."  *Id.* at 878.  At most, *Glenn* indicates that under the facts of that case, it was possible the officer's use of force violated a constitutional right.  Thus, *Glenn* did not "clearly establish" that Engle and Emanuel's actions here would violate O'Brien's constitutional rights.

Construing the video evidence in the light most favorable to Plaintiffs, the

---

[3] Notably, in *Glenn*, it appears there was no video evidence, thus some key facts were in dispute.

Court finds existing case law does not clearly establish that Engle and Emanuel

violated the law.  Accordingly, Engle and Emanuel are entitled to qualified

immunity.  As such, Engle and Emanuel's Motion for Summary Judgment as to

Plaintiffs' §1983 claim in Count I should be granted.

### b.      Immunity under Montana Code Ann. § 2-9-305(5)

Engle and Emanuel move for summary judgment on Plaintiffs' negligence

(Count III), survivorship (Count IV), wrongful death (Count V), and assault and

battery (Count VI) claims on grounds that they are immune from individual

liability under Montana Code Ann. § 2-9-305(5).

Section 2-9-305(5) provides:

> Recovery against a governmental entity under the provisions of parts
> 1 through 3 of this chapter constitutes a complete bar to any action or
> recovery of damages by the claimant, by reason of the same subject
> matter, against the employee whose negligence or wrongful act, error,
> omission, or other actionable conduct gave rise to the claim.  In an
> action against a governmental entity, the employee whose conduct
> gave rise to the suit is immune from liability by reasons of the same
> subject matter if the governmental entity acknowledges or is bound by
> a judicial determination that the conduct upon which the claim is
> brought arises out of the course and scope of the employee's
> employment, unless the claim constitutes an exclusion provided in
> subsections (6)(b) through (6)(d).

Mont. Code Ann. § 2-9-305(5).

Plaintiffs contend §2-9-305(5) does not provide immunity from suit, but

rather only applies after there has been recovery against a governmental entity.

Plaintiffs rely on *Story v. City of Bozeman*, 856 P.2d 202 (1993) in support of their

22

argument.[4]  But the Montana Supreme Court has since expressly held "[§] 2-9-305(5), MCA, serves as a complete bar to holding [individual employees] liable because it provides immunity from suit to individually-named defendants for actions performed within the course and scope of the official's employment." *Griffith v. Butte School Dist.* 244 P.3d 321, 335 (Mont. 2010).  *See also Germann v. Stephens*, 137 P.3d 545, 553 (Mont. 2006) ("The explicit grant of immunity in the second sentence of § 2-9-305(5), MCA, belies [the plaintiff's] contention that the statute serves merely as an anti-double recovery statute."); *Kiely Constr., LLC v. City of Red Lodge*, 57 P.3d 836, 855 (Mont. 2002) ("[W]e conclude the first sentence of § 2-9-305(5), MCA, is on its face, a complete bar to holding the individual council members liable.").

Recent authority from this district has likewise recognized that §2-9-305(5) provides immunity from suit.  *See e.g. Marten v. Haire*, 2019 WL 1858504, *3 (D. Mont. April 25, 2019) (rejecting argument that §2-9-305(5) only provides immunity from recovery if the State is ordered to pay damages and does not provide immunity from suit); *Estate of Ramirez v. City of Billings*, 2019 WL 366894 (D. Mont. Jan. 30, 2019) (same); *Todd v. Baker*, 2012 WL 1999529, *13

---

[4] Plaintiffs also cite *Martin v. Justad*, 2018 WL 1525508 (D. Mont. March 28, 2018).  The court, however, changed its holding in a later decision in the same case.  *See Marten v. Haire*, 2019 WL 1858504 (D. Mont. April 25, 2019) (finding defendant was entitled to summary judgment because he was immune under §2-9-205(5)).

(D. Mont. June 4, 2012) (finding law enforcement officers entitled to immunity under §2-9-305(5) at summary judgment stage); *Russo-Wood v. Yellowstone Cty.*, 2019 WL 1102680, *7 (D. Mont. March 7, 2019) (same).

In order for immunity to attach under § 2-9-205(5), the plaintiff must (1) name a governmental entity as a defendant, and (2) the governmental entity must acknowledge or be bound by a judicial determination that the employee's conduct upon which the claim was brought arose out of the course and scope of his employment.  Mont. Code Ann. § 2-9-205(5).

Here, the City of Livingston, a government entity, is a named defendant.  All of Plaintiffs' allegations against Engle and Emanuel are based on actions they performed while in the course and scope of their employment as law enforcement officers.  The City has also acknowledged that Engle and Emanuel were acting in the course and scope of their employment when they shot O'Brien.  (Doc. 26 at ¶ 6.)  No evidence suggests either Engle or Emanuel were acting outside their roles as City of Livingston Police officers at any time relevant to Plaintiffs' claims.  Consequently, Engle and Emanuel are immune under § 2-9-205(5) from individual liability for Plaintiffs' negligence, survivorship, wrongful death, and assault and battery claims.

Therefore, Engle and Emanuel's Motion for Summary Judgment as to Plaintiffs' common law claims in Counts III-VI should be granted.

**B.      Engle and Emanuel's Motion for Partial Summary Judgment**

Engle and Emanuel have also filed a Motion for Partial Summary Judgment regarding Plaintiff Robin Larson's claim for loss of consortium.  (Doc. 40.)  They assert O'Brien and his mother, Larson, did not have the extraordinarily close and interdependent relationship which is required before the parent of a deceased adult child may bring a claim for loss of consortium.  In response, Plaintiffs concede that Larson is not able to satisfy the test for parental loss of consortium articulated in *Hern v. Safeco Ins. Co.*, 125 P.3d 597 (Mont. 2005).  Plaintiffs state they do not contest the dismissal of Larson's claim for loss of consortium.  (Doc. 51.)

Accordingly, the Court recommends that Robin Larson's loss of consortium claim be dismissed.

## IV.    CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that:

1.      Defendants Engle and Emanuel's Motion for Summary Judgment (Doc. 23) be **GRANTED**;

2.      Defendants Engle and Emanuel's Motion for Partial Summary Judgment (Doc. 40) be **GRANTED**.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to

the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

**IT IS ORDERED**.

DATED this 22nd day of January, 2020.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge